UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Case No. 23-cr-155 (RBW) |
| v. | : | |
| | : | |
| AUSTIN BRENDLEN HARRIS, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Austin Brendlen Harris to 30 days of incarceration. The government also requests that this Court impose a special assessment of $10, and, consistent with the plea agreement in this case, $500 in restitution.

**I.    Introduction**

Defendant Austin Brendlen Harris, a 42 year-old medical doctor, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Harris pleaded guilty to a violation of Title 40, United States Code, Section 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. The government's recommendation is supported by Harris': (1) encouragement to other rioters to participate in the attack on the Capitol; (2) comparisons of police officers defending the Capitol to Nazis; (3) entry into the Capitol at 2:15 p.m., just two minutes after its initial breach; (4) movement past broken police lines as those lines were overrun by rioters; and (5) after January 6, his attempts to cast blame for the attack onto others. The government has also considered the fact that Harris made clear his intention to accept responsibility for his actions at the time of his arrest and did so at the earliest opportunity.

The Court must consider that Harris' conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on large numbers to vastly outnumber and overwhelm police, breach the Capitol, and disrupt the Congressional proceedings. But for his actions with the many others, the riot likely would have failed. Here, the facts and circumstances of Harris' crime support a sentence of 30 days' incarceration and $500 restitution.

## II. Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 25 ¶¶ 1-7.

*Defendant Harris' Role in the January 6, 2021 Attack on the Capitol*

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

On December 27, 2020, Harris posted to his Parler account that he was looking for hotels in Washington, D.C. for January 6, 2021. He wrote, "Does anyone know which hotels in DC the Trump supporters will be staying at for the DC rally Jan 6th?" He also noted, "I want to be with the MAGA crowd, not accidentally mixed in with the 'wrong' protestors [wink emoji]." Harris then made arrangements and flew to Washington, D.C. on January 5, 2021. On January 6, Harris attended the "Stop the Steal" rally at the Eclipse. After the rally, Harris walked with other protesters towards the Capitol, which was already under siege.

At approximately 2:00 p.m., Harris joined other rioters on the Lower West Terrace and, as the police became increasingly overwhelmed in attempts to push back the violent mob. Surveillance videos and law enforcement body-worn cameras recorded Harris at the Capitol and inside the building. Harris can be overheard comparing the police to Nazis. Statement of Offense, ¶ 6 (ECF 25). The images also show Harris in physical contact with uniformed Metropolitan Police Department (MPD) Officers during his confrontation with officers on January 6, 2021.



3



*Images 1-3: Images from Metropolitan Police body-worn camera footage show Harris confronting officers on the Lower West Terrace of the Capitol building.*

Despite the clear presence of law enforcement officers attempting to restrain the mob, Harris continued past law enforcement and climbed the stairs to the Upper West Terrace. An open-source video captured Harris on the Upper West Terrace when he looked over an area where other rioters were climbing a wall and attempting to overtake the Capitol building. Harris also filmed the events with his phone and encouraged other rioters to climb up and join in the attack. Statement of Offense, ¶ 11. He also deleted the images he had recorded from his phone shortly after he took them, which indicates that he knew they would be incriminating.



*Image 4: Harris on the Upper West Terrace urging rioters to scale the wall.*

At 2:15 p.m., Harris breached the Capitol building and entered through the center door of the Senate Wing door, just two minutes after that door was first breached. Statement of Offense, ¶ 12. The door had been broken, and the windows on either side had been smashed. Harris would have seen the broken door and windows when he entered. He also would have heard the alarms that had been triggered at the broken door and windows, as well as the officers in the building. Harris recorded the entry on his phone, and he then entered the hallway to the Crypt. While inside the Crypt, Harris attempted to bypass police, and he engaged verbally with them. Harris and other rioters then moved past the police and up the stairs to the second floor and the Statuary Hall.



*Image 5:  Harris entered the Capitol building through the Senate Wing door.  Windows were broken on either side, and the alarm had been triggered.*



*Image 6:  Harris moved past police and entered Statuary Hall.*

Harris eventually moved with the crowd down the hallways to the Speaker's Lobby. Police eventually directed him and others out of the Capitol building at approximately 2:56 p.m., through the Upper House door.  Statement of Offense, ¶ 13.



*Image 7:  Police directed Harris and others out of the Capitol.*

Harris returned to Los Angeles the next day, on January 7, 2021.

*Harris' Social Media Posts*

Harris posted on social media both before and after January 6, 2021.  In December 2020, Harris posted on Parler about his intentions to travel to Washington, D.C., as well as his desire to stay at a location with people who shared his views.  Harris continued posting to social media after the attack.  Even though he participated directly in the events, he nonetheless tried to obscure his own conduct on January 6, 2021 and claimed only to have been "treating trauma patients at the capitol building."  Harris also blamed the attack on "Antifa dressed up like Trump supporters," when he himself knew he had pushed against law enforcement officers and that the rioters had forced their way past police and into the Capitol building.  Harris also posted that January 6, 2021 was a "false-flag event" and warned that "This is the tipping point where we become the cowed and oppressed citizens of countries like China."



*Item 8:  Harris' social media post after the January 6, 2021 riot.*

*Post-arrest Interview with the FBI*

    Harris was interviewed by the FBI on January 23, 2024.  He was not entirely forthcoming in the interview.  For example, he claimed not to have known that uniformed officers in riot gear were police, even though the officers' uniforms were clearly marked.  *See* Images 1-7.  Nonetheless,  Harris did acknowledge responsibility for his actions.  He did ultimately admit his offenses, and he repeatedly stated his regret and remorse for what he had done.

8

*The Charges and Plea Agreement*

On May 9, 2023, the United States charged Harris by a single-count Information with violating 40 U.S.C. § 5104(e)(2)(G). On June 15, 2023, pursuant to a plea agreement, Harris pleaded guilty to the Information, charging him with the violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Harris agreed to pay $500 in restitution to the Architect of the Capitol.

**III.   Statutory Penalties**

Harris now faces a sentencing for violating 40 U.S.C. § 5104(e)(2)(G). As set forth in the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* ECF 24 ¶ 11; 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

**IV.   Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of the recommended sentence.

**A.  The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Harris' participation in that attack to fashion a just sentence, this Court should consider various

aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Harris, the absence of violent or destructive acts is not a mitigating factor.  Harris is not charged with violent or destructive acts, and had he engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Harris' case is his level of understanding about the nature of the attack on January 6, 2021 and his decision to join in the events, and then his efforts to later cast blame for his actions on Antifa or other actors.  While there is no evidence that Harris engaged in violent acts himself, during the course of his movement into the Capitol on January 6 and the roughly 40 minutes he spent inside, he would have witnessed all manner of attacks on police and threats against the members of Congress.  His movement through the restricted grounds required that he pass through barricades, signs, flash-bangs, chemical deterrents, audio alarms and heavily-geared police officers.  It is also very clear in the images recorded from the MPD body worn footage that Harris was directly engaged in the confrontation with officers on the West Lawn.  *See* Images 1-3.  Harris, nonetheless, chose to participate in the riot on January 6, 2021.  He, in fact, traveled to Washington, D.C. for that purpose and, once there, and having confronted what he himself described in his own social media posting as the "chaos in the capitol building" (*See* Item 8), he continued on with it, past all the barricades, signs, alarms, and police, until he climbed the steps of the Capitol.  There, he encouraged others to participate, and, eventually, he entered the Capitol building himself, through a broken Senate Wing door, where the windows on either side were also broken and alarms sounded all around.

The nature and the circumstances of this offense establish the clear need for the recommended sentence in this matter.

### B. Harris' History and Characteristics

Harris is a highly educated person with a doctorate and a medical degree. He has advanced-level certifications from multiple prominent universities. Harris also has significant assets and income.

As set forth in the PSR, Harris' criminal history includes three convictions for Driving Under the Influence (DUI) between 2002 and 2017. ECF 29 ¶¶ 32-36. Harris was given probationary sentences for each of those convictions, although the sentence for his 2012 conviction included 96 hours in jail. ECF 29 ¶ 35. Harris was on probation with the Medical Board of California as a result of his 2017 DUI conviction. ECF 29 ¶¶ 72-75. The fact that he was already "under supervision and required to check-in daily with the Medical Board of California" suggests a history of poor decision-making.

*Primum non nocere* ("First, do no harm") is the oath that Harris took when he became a medical doctor. Harris has a history of doing actual harm—as evidenced by his multiple DUI convictions, and now, his participation in the attack on the Capitol. One would also expect him to recognize and appreciate peril to the lives and well-being of others, most especially the police officers who were attacked by the violent mob for hours on January 6, 2021.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on

11

our democracy itself and an attack on the singular aspect of democracy that makes America, and that's the peaceful transfer of power.").

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010). In this case, the need for the sentence to afford adequate deterrence supports the recommended sentence.

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37). General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of the recommended sentence. Harris' criminal history, which includes repeated DUI offenses, multiple probationary sentences, probation and supervision with the Medical Board of California, and the current offense, are at odds with his educational background, substantial means, and his responsibilities as a medical doctor. They reflect more than a clear pattern of

disrespect for the law, but a deliberate choice he made in the days leading up to January 6 to oppose the law and the structures of constitutional government. *See* PSR ¶ ¶ 32-36. To this point, it is significant that Harris has been afforded substantial probationary sentences on three prior occasions. He was also on probation with the Medical Board of California and "required to check in daily" with that Board as a result of his 2017 DUI conviction. PSR ¶ 75. It is likely that Harris did not inform the California Medical Board that he was planning to participate in the January 6 riot when he "checked in daily" with them. Harris' history of poor decision-making, and his apparent inability to abide by rules, make clear that specific deterrence is necessary in this case.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[2] This Court must sentence Harris based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Harris has pleaded guilty to the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid

---

[2] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Russell Peterson*, 21-cr-309 (ABJ), the defendant also pled guilty to the misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (disorderly conduct in the Capitol building). Peterson drove to Washington, D.C. with his wife and attended the "Stop the Steal" rally, before making his way and eventually entering the Capitol building. He returned home after and posted on social media that he had "stormed the castle broke into chambers and smoked a blunt on the couch." Peterson also acknowledged having been mace and tear gassed. Judge Jackson sentenced the defendant to 30 days of incarceration, in addition to the $10 special assessment and $500 in restitution. Similarly, in *United States v. Jon Heneghan and Carol Kicinski*, 22-cr-61-RBW, the defendants pled guilty to Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. 1752(a)(1), after the entered the Capitol building through the breached Senate Wing Door and entered the Speaker's Office and Suite, where Kicinski recorded a video and commented about the Speaker having been forced to leave in a hurry. This Court sentenced both defendants to 20 days' incarceration, 1 year of supervised release, a $25 special assessment, and $500 in restitution.

V.   **Restitution**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary

14

authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[3] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Harris must pay $500 in restitution, which reflects in part the role Harris played in the riot on January 6.[4] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Harris' restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 117.

---

[3] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[4] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VI. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Harris to 30 days' incarceration, a special assessment of $10, and, consistent with the plea agreement in this case, $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Harris' liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

    Respectfully submitted,

    MATTHEW M. GRAVES
    United States Attorney
    D.C. Bar No. 481052

By:    s/ *Christopher Brunwin*
    Assistant United States Attorney
    California State Bar No. 158939